In re Virgil L. HESS and Linda L. Hess, Individually and d/b/a Tumbleweed Production Co. and d/b/a Cold Lake Production Co., Debtors.

In re KODIAK DRILLING, INC., f/k/a M.L.F. Corp., Debtor.

Virgil L. HESS and Linda L. Hess, Individually and d/b/a Tumbleweed Production Co. and d/b/a Cold Lake Production Co., and Kodiak Drilling Inc., f/k/a M.L.F. Corp., Plaintiffs,

v.

The BANK OF OKLAHOMA, OKLAHOMA CITY, N.A., Defendant.

Bankruptcy Nos. 286–20030, 286–20029. Adv. No. 286–2019.

United States Bankruptcy Court, N.D. Texas, Amarillo Division.

June 23, 1986.*

Larry Sherman, Gibson, Ochsner & Adkins, Amarillo, Tex., for debtors.

David Mullin, Whittenburg, Whittenburg & Schachter, Amarillo, Tex., for Bank of Oklahoma.

William T. Neary, U.S. Trustee, U.S. Dept. of Justice, Dallas, Tex., U.S. Trustee.

## MEMORANDUM OF DECISION

JOHN C. AKARD, Bankruptcy Judge.

The Debtors in the captioned proceedings under Chapter 11 of the Bankruptcy Code filed a Complaint seeking a declaration of the effect of § 552 of the Bankruptcy Code[1] on their prepetition financing agreements with the Bank of Oklahoma, Oklahoma City, N.A. (Bank). The matter was presented to the Court on stipulated facts contained in the Pretrial Order.

On or about April 29, 1985, the Debtors executed and delivered to the Bank a Promissory Note (Note) in the original principal

---

* This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

1. The Bankruptcy Code is contained in Title 11 of the United States Code. 11 U.S.C. § 552(a) reads as follows:

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

amount of $3,100,000.00. The Note calls for monthly payments of $100,000.00 each, including both principal and interest, with the first payment due on June 15, 1985. The balance due on the Note and the number of delinquent payments, if any, were not stated in the stipulation.

At the same time, the Debtors executed a "Mortgage, Deed of Trust, Assignment of Production, Security Agreement and Financing Statement" (Deed of Trust) covering numerous oil and gas leases in the State of Texas and one lease in the State of Colorado [2] (the Property). The Deed of Trust covered all of the Debtors' interest in the Property together with various rights that might relate to the Property and specifically included the following:

All of the [Debtors'] right, title and interest in, to and under, or derived from, oil, casinghead gas and gas sales, purchase, exchange and processing contracts and agreements, and all other contracts, agreements and instruments, whether now in existence or hereafter made, which relate to any of the [Property].

For convenience, the oil and gas in place under the ground will be referred to as the Minerals and the oil and gas upon reaching the surface will be referred to as the Production.

The parties stipulated that the Bank had properly perfected its liens on real estate and on personal property under Texas law. The Debtors filed petitions under Chapter 11 of the Bankruptcy Code on January 21, 1986.

The Debtors forcefully argue that the Production is "after acquired property" under § 552(a) of the Bankruptcy Code because the Minerals are part of the real estate. In Texas, Minerals are considered real estate and governed by real estate law while Production is considered personalty and is governed by the law of personal property. *United States v. Texas Eastern Transmission Corp.*, 254 F.Supp. 114, 118 (W.D.La.1965); *Onyx Refining Co. v. Ev-*

*ans Production Corp.*, 182 F.Supp. 253, 256 (N.D.Tex.1959); *Phillips Petroleum Co. v. Mecom*, 375 S.W.2d 335 (Tex.Civ. App.—Austin 1964, no writ).

It is settled under Texas law that the holder of a lien on the real estate (including the Minerals) does not have a lien on the Production because it is personal property. *Onyx Refining Co. v. Evans Production Corp., supra* at 256. This is true even where the lien on the real property is a mechanic's lien for work performed on an oil and gas well. *Wilkins v. Fecht*, 356 S.W.2d 855 (Tex.Civ.App.—San Antonio 1962, writ ref'd); *Crowley v. Adams Bros. & Prince*, 262 S.W. 883 (Tex.Civ.App.— Amarillo 1924, no writ).

The ownership of the Minerals is subject to the Rule of Capture. Thus, if A, by lawful drilling and production on his land, drains the oil and/or gas from under B's land, B has no cause of action against A. *Magnolia Petroleum Co. v. Blankenship*, 85 F.2d 553, 554 (5th Cir.1936), *cert. denied*, 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449 (1936); *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 562 (1948). B's remedy is to drill and produce from his land. Since this competition led to waste, the Texas Railroad Commission was given regulatory authority over the drilling and production of oil and gas in Texas. *Magnolia Petroleum Co. v. Blankenship, supra* at 555.

The Debtors interpret the Rule of Capture to say that a landowner has no rights in the oil and gas until it is brought to the surface and captured. They then conclude that in the instant case they have no rights in the oil and gas until it is brought to the surface. Since the oil and gas is brought to the surface after the filing of the Bankruptcy Petition, the Debtors assert that postpetition Production is after acquired property under § 552(a) of the Bankruptcy Code and not subject to the prepetition liens of the Bank.

2. Although the Deed of Trust listed one lease in the State of Colorado, the parties agreed during oral argument that this matter related only to oil and gas leases in the State of Texas. No opinion is rendered with respect to Colorado law.

Further, the Debtors point out that § 9.203(a) of the Business & Commerce Code of the State of Texas [3] requires three things in order to perfect a security interest in personal property:

(1) Either that the secured party have possession of the collateral or that an appropriate security agreement has been signed;

(2) Value has been given, and

(3) The debtor has rights in the collateral.

It is the Debtors' position that since the oil and gas is real property until brought to the surface, the Debtors have no "rights" in the postpetition Production until it reaches the surface. In substance, the Debtors argue that when the oil and gas changes from real to personal property, the personal property is a new asset which is acquired postpetition; thus, under § 552(a) of the Bankruptcy Code, it is not covered by the Bank's prepetition liens.

The Debtors suggest that the Bank's lien only covers the real estate (i.e., the Minerals) and that the Bank can be adequately protected either by an equity cushion or by adequate protection payments.[4] Determination of the existence or nonexistence of an equity cushion and the amount of any adequate protection payments would require substantial engineering testimony from both parties.

It is the feeling of the Court that the Debtors' emphasis on the Rule of Capture is misplaced. Under the Rule of Capture the Minerals are part of the real estate owned by the landowner, but are subject to being lost through the Rule of Capture. The landowner is entitled to recover damages if the loss of the Minerals results from something other than proper drilling on the neighbor's land. *Elliff v. Texon Drilling Co., supra* at 563.

When oil and gas are produced, they are the same oil and gas which were under the ground, and are still owned by the landowner (or his Mineral lessee). When oil and gas are produced, they become personal property and the lien of the Bank on the real estate is subject to being lost unless the Bank's security documents cover Production and are properly perfected as to personal property. In the instant case the Bank's properly perfected liens cover the oil and gas in the ground and continue to cover the oil and gas as (and after) it is produced. The Debtors do not acquire any new "rights" in the oil and gas as it is produced; they had "rights" in the oil and gas before it was produced. The change of legal designation from real property to personal property does not dislodge the Debtors' ownership nor the Bank's liens. In effect, the Bank has a continuing lien on the oil and gas, wherever located.

Here we are *not* dealing with after acquired property, but rather with the same property. To be sure, the property is in a different location—on the surface—whereas it formerly was under the surface, but it is in the same form.

Interestingly, one Texas case dealing with a Deed of Trust on real estate announced the general rule that a lien on the real estate does not cover the Production where the mortgagor remains in possession and operates as contemplated by the parties when the mortgage was given, but upheld the trial court's award of the proceeds of the production in a State Court receivership to the holder of the Deed of Trust. The Court said the Receiver did not succeed to the rights possessed by the mortgagor. *Texas Co. v. Kent,* 60 S.W.2d 857, 859–60 (Tex.Civ.App.—Waco 1933, writ dismissed).

As the Debtors suggest, this decision will result in a delay in payments to the unsecured creditors in a reorganization. On the other hand, if this were a liquidation, it is entirely possible that there would be no funds available for the unsecured creditors. The stipulated facts in this proceeding do not give the Court any information upon

---

**3.** In pertinent part, the Texas Business and Commerce Code is the Texas adoption of the Uniform Commercial Code.

**4.** This would be the proper procedure if the Bank's lien only covered real estate.

which to base a conclusion about a liquidation.

This Court must now face the realities of this decision in a reorganization under Chapter 11 of the Bankruptcy Code. At the time the loan was made, the parties undoubtedly contemplated that the Debtors would operate the wells and pay for the expenses of operating and maintaining the wells, including repairs and reasonable overhead (Operating Expenses) from the production of the wells. They expected that the wells would produce sufficient income to pay the Operating Expenses plus the $100,000.00 per month payments to the Bank. The stipulation does not state that these expectations were not realized due to the general reduction in oil and gas production and the decline in oil prices, but the Court assumes this to be the case.

The Order which will accompany this Memorandum will provide for the continued operation of the wells and the payment of the Operating Expenses during the pendency of the Chapter 11 proceedings or until further Order of the Court. The remaining proceeds of Production will be paid to the Bank until its payments have been brought current.

ORDER accordingly.